**In re Robert LAING, Debtor.**

**R. Todd Neilson, Trustee of the Estate of Reed E. Slatkin and the Substantively Consolidated Affiliates Topsight Oregon, Inc. and Reed Slatkin Investment Club, L.P. Liquidating Trust Plaintiff,**

v.

**Robert Laing, Defendant.**

**Bankruptcy No. 9:04–bk–03621–ALP.**

**Adversary No. 9:04–ap–402–ALP.**

United States Bankruptcy Court, M.D. Florida, Fort Myers Division.

Aug. 1, 2005.

Alberto F Gomez, Jr., Morse & Gomez, PA, Tampa, FL, for Debtor.

Robert E. Tardif, Jr., Ft. Myers, FL, for trustee.

### FINDINGS OF FACTS, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Bankruptcy Judge.

THE MATTER under consideration in this Chapter 7 case is a Four–Count Complaint filed by R. Todd Neilson (the Slatkin Trustee) in the above-captioned adversary proceeding.

In Count I of his Complaint, the Slatkin Trustee seeks an Order from this Court declaring that Robert Laing (the Debtor) is not entitled to claim the constitutional protection of his homestead, which is his Condominium located in Naples, Florida, because he was not a bona fide resident of this State on February 25, 2004, when he filed his bankruptcy case. In the alternative, the Slatkin Trustee seeks the imposition of an equitable lien on the Condominium to secure a debt of $274,000.00 which, according to the Slatkin Trustee, was funds the Debtor obtained from a fraudulent Ponzi scheme operation, and which the Slatkin Trustee is entitled to recover under the applicable law.

In Count II of the Complaint, the Slatkin Trustee claims that the Debtor "fraudulently transferred assets within the one-year period [be]for[e] the Petition Date, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with the custody of property under the Bankruptcy Code, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed such property." Therefore, the Trustee

requests an entry of judgment denying Laing's discharge pursuant to Bankruptcy Code Section 727(a)(2)(A).

In Count III of the Complaint, the Slatkin Trustee alleges two separate and independent grounds which warrant, according to the Slatkin Trustee, a denial of a discharge pursuant to Section 727(a)(3)(failed to keep records, etc.) and Section 727(a)(4)(A)(false oath) if established by competent proof. First, the Trustee alleges that "Laing has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which his financial condition or business transactions might be ascertained, and such act or failure to act is not justified under all the circumstances of this case" pursuant to Section 727(a)(3). The Second allegation is based on Section 727(a)(4)(A) by alleging that "Laing knowingly and fraudulently, in or in connection with this case, made a false oath or account."

In Count IV of the Complaint, the Slatkin Trustee challenged the Debtor's right to a general discharge on the grounds that the Debtor "failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of asset to meet his liabilities," specifically, the Debtor "failed to explain the loss of his Missing Funds." Therefore, he is not entitled to a discharge by virtue of Section 727(a)(5) of the Code.

In due course, the Debtor filed his Answer to the Complaint in which he sets forth some admissions and denials coupled with some affirmative defenses. In his Answer, the Debtor also contends that the Complaint filed by the Slatkin Trustee was not timely filed. In addition, he contends that the Complaint was intentionally filed in the Orlando Division of the Middle District of Florida on or about June 25, 2004. The Clerk of the Orlando Division forwarded the Complaint to the Tampa Division and it was date stamped by the Tampa Division Clerk on June 28, 2004. However, the Debtor asserts that due to a previous Court Order which required the Plaintiff to file his Complaint by June 25, 2004, the Complaint was untimely. The Court considered the Objection and overruled same and determined that the Complaint was not untimely and directed the trial to proceed as scheduled.

This Court having heard argument of counsel, extensive testimony of witness at the Final Evidentiary Hearing, and considered voluminous documentary evidence, now finds and concludes as follows:

## SLATKIN'S CALIFORNIA BANKRUPTCY

Reed E. Slatkin (Slatkin) operated an investment banking business from 1986 up to or about April 21, 2001. Slatkin's operation was ultimately determined to be a fraudulent Ponzi scheme and resulted in a multi-count indictment, to which Slatkin pled guilty and he is currently serving a fourteen year term in the Federal Penitentiary. *See United States of America v. Reed E. Slatkin,* United States District Court for the Central District of California, Case No. CR 02–313.

On May 1, 2001, Slatkin filed his voluntary Petition for Relief under Chapter 11 (Slatkin Bankruptcy Case). On May 16, 2001, R. Todd Neilson was appointed the Trustee for the Chapter 11 estate by the United States Bankruptcy Court for the Central District of California, Northern Division (the California Bankruptcy Court).

On December 17, 2001, the Slatkin Trustee filed his first interim report in the Slatkin Bankruptcy Case in which he identified the Debtor as the third largest recip-

ient of funds from Slatkin, which the Slatkin Trustee claimed to be proceeds of the Ponzi scheme operated by Slatkin. The Slatkin Trustee indicated in his report that he intended to sue all of the "net recipients" of the proceeds. The term apparently meant that these were the parties who obtained an amount greater than what they had invested with Slatkin in the Ponzi scheme.

The Slatkin Bankruptcy Case was somewhat a "cause celebre" and was fully covered by the media. It is without dispute that the Debtor was familiar with the progress of Slatkin's bankruptcy. In fact, upon learning of the Slatkin bankruptcy, the Debtor immediately employed a law firm to represent his interests in the case. He also filed a proof of claim, a request for notice, and attended several hearings. There is no question that at that time the Debtor was aware that he may be facing a very significant lawsuit against him, and the possibility that the Slatkin Trustee might prevail in that litigation.

It is not in serious dispute that the Debtor received approximately $5 million from Slatkin over a period of time. The payment of funds to the Debtor from Slatkin dates back to 1989 and the last payment the Debtor received from Slatkin was on January 13, 2000, or more than four years prior to his February 25, 2004, Petition date. Eventually, on July 31, 2002, the Slatkin Trustee sent a demand letter to Laing seeking the return of $5,334,131.89 in fraudulently transferred funds from Slatkin. On September 25, 2002, he filed a Complaint against Laing for the recovery of the $5,334,131.89.

## DEBTOR'S EMPLOYMENT AND RESIDENCE HISTORY

The Debtor was born and raised in Iowa and lived in the Midwest until he moved to the San Francisco area of California in the late 1970s. From that time forward his employment history included: CEO of U.S. Portfolio Leasing, a New York Stock Exchange publicly traded company; President of U.S. Instrument Rentals and U.S. Leasing Corporation. He was the founder of a company called Quantum Analytics, and he was the President of Link Capital, an investment company. The Debtor was with Link Capital in 1994 when he moved to Illinois where he lived until 2000. On June 29, 2000, the Debtor sold his Illinois residence for approximately $2,845,000.00 and netted $1,207,516.75 from the sale (Debtor's Exh. No. 10). On July 14, 2000, he and his wife purchased a home in Santa Barbara, California, for approximately $3,150,000.00. The purchase price was paid by a deposit of $1,136,300.00 and the balance financed (Debtor's Exh. 11). Although the Debtor's wife and her two children resided in the Santa Barbara residence, the Debtor continued to maintain an apartment in Chicago well into 2001. He commuted back and forth because he worked for Link Capital, whose business was located in Illinois. His last day of work with Link Capital was August 31, 2001. Although it is unclear when the Debtor actually moved to California, it appears that he was winding down his business affairs with the hope to retire in California. Further, he stated that their children were almost grown, and his wife did not like the Midwest and was very fond of and wanted to settle in California.

## THE HOMESTEAD CLAIM OF THE DEBTOR

In January 2002, shortly after the Slatkin Trustee filed his first interim report, the Debtor flew to Florida. He obtained a Florida Driver's license on January 29, 2002, (Debtor's Exh. No. 14) and rented a post office box in Islamorada in the Florida Keys, ostensibly to establish a mailing

address in Florida. On April 10, 2002, the Debtor and his wife sold the Santa Barbara house, after having put the house on the market October 10, 2001, which resulted in a net profit of $1,214,172.22. On April 1, 2002, the Debtor entered into a lease with his wife for a residence located in Montecito, California, a city located near Santa Barbara. The lease requires a monthly rental payment of $4,000.00. On April 18, 2002, the Debtor purchased the Condominium in Naples, Florida, for $1,843,806.74 million, the bulk of which was paid for by cash. This Condominium is the residence he claims as his homestead.

On April 16, 2002, when Mr. Laing filled out his application to purchase the Naples Condominium, he indicated that it would be his primary residence (Debtor's Exh. No. 22). On April 18, 2002, he opened his account with Florida Power & Light for the Condominium address and has continued to maintain such service to the present date (Debtor's Exh. No. 17). On June 25, 2002, he registered his 2000 Mercedes vehicle with the State of Florida (Debtor's Exh. No. 18). When he filed his California Nonresident or Part–Year Resident Income Tax Return for 2002, he listed his Condominium in Naples as his address and indicated that he became a nonresident of California on January 29, 2002 (Debtor's Exh. 20).

In May 2002 he registered to vote and obtained a Voter's Registration with the State of Florida (Debtor's Exh. No. 15). He also opened bank accounts at the Bank of America and AmSouth Bank (Debtor's Exh. 21). In 2003 he filed for homestead exemption on the Condominium, which he renewed again in 2004 (Debtor's Exh. 23). On his 2003 Florida Intangible Personal Property Tax Return for Individual and Joint Filers as of January 1, 2003, and listed his Naples Condominium address (Debtor's Exh. No. 16).

Although Mrs. Laing did visit the Condominium, she maintained her residence in California uninterrupted and never established any residence in the Florida Condominium in Naples. As a matter of fact, the Debtor himself spent at least 266 days in California, compared to the 164 days he spent in Florida, between May 1, 2002, and February 25, 2004, the date he filed his voluntary Petition for Relief. During the relevant 180 days preceding the filing date, the Debtor was physically present in Florida for 114 days out of the 180 days, or the longer portion of the time pursuant to the residency requirements of Section 522.

It is also true that during this time the Debtor spent $208,000.00 paying expenses which were incurred in California, which consisted of $78,000.00 in credit card charges made in California and $130,000.00 in California related payments, which included the lease payments on the California house.

The Debtor claims that he came to Florida seeking a job opportunity with a company called FairView. The fact that it was not until one year after he moved, and ten months after he purchased the Condominium in Naples, he entered into a consulting agreement with FairView is of no consequence. While it is true that he did not become an employee of FairView, he obtained his position as an independent contractor. It appears that the Debtor did not earn any commission for the work that he performed for FairView so far, and the only payment he received was a cost reimbursement for one trip he made on behalf of FairView.

The Debtor's consulting agreement with FairView did not prohibit him from pursuing any other opportunities. In fact, the Debtor sought and ultimately entered into another consulting agreement with Barrington Medial Imaging. (Plaintiff's Exhibit 30, Confidential Sales Consulting

Agreement, dated July 1, 2003). Furthermore, the Debtor also pursued employment with a company call Insight Associates. The Consulting Agreement between the Debtor and Insight Associates was for the Debtor to serve as the CEO, with an effective date of March 1, 2003. However, the employment with Insight Associates never actually became a reality. (Plaintiff's Exhibit 31, Consulting Agreement). Both Barrington Medial Imaging and Insight Associates are located in Illinois. The Debtor's consulting agreements with the above-mentioned companies did not require his physical presence in Illinois and, therefore, his business could have been done over the telephone or through using the internet.

## MARITAL STATUS OF THE DEBTOR

As noted earlier, the Debtor is married and his wife has resided, and continues to reside, in California. It is without dispute that on February 16, 2004, nine days before the Debtor filed his Chapter 7 case, he entered into a letter agreement purporting to formalize their separation. (Plaintiff's Exhibit 57, Separation Letter dated February 16, 2004) The letter is dated February 16, 2004. However, Mrs. Laing testified she received it sometime within a month after that date. Mrs. Laing did not retain an attorney to represent her in this claimed separation or possible divorce proceeding.

It appears that on March 9, 2004, the Debtor informed his wife by letter of the purchase of his Condominium and stated that: "We have invested in a beach-front condominium in Naples whose address is 8111 Bay Colony Drive, Unit 1704.... The market for beach-front property is extremely strong and I am confident that your half will be significantly in excess of $1 million when we sell." (Plaintiff's Exh. No. 22) In addition, in the same letter the

Debtor stated that: "Regarding the question of support, I am paying you 4,000 a month in support payments which will continue indefinitely, as well as paying the carrying costs for the investment property."

Basically, these are the facts as established at the Final Evidentiary Hearing based on which the Slatkin Trustee contends that the Debtor is not a bona fide resident of the State of Florida; that the Condominium he purchased in Naples was purchased for investment; and that he has no intent to permanently reside in this State. This being the case, according to the Slatkin Trustee, the Debtor does not qualify for homestead exemption which requires the actual intention to permanently reside in and actually use and occupy the property claimed as exempt. *See In re Dwyer,* 305 B.R. 582, 585 (Bankr.M.D.Fla. 2004). *See also In re Lowenschuss,* 171 F.3d 673, 685 (9th Cir.1999), *cert. denied sub nom. Lowenschuss v. Selnick,* 528 U.S. 877, 120 S.Ct. 185, 145 L.Ed.2d 156 (1999).

The Slatkin Trustee placed a great emphasis on the fact that the Debtor's wife remained in California and retained her residence in California and that the parties' separation is now supposed to be formalized. Factually, this is correct statement, although it should be noted that there is no action pending in any court to formally establish the separation or seek a dissolution of the marriage. It is well established in Florida that the separation of the spouses is of no significance for the purpose of determining the Debtor's entitlement to claim homestead. As stated in the case of *In re Isaacson,*

"We see nothing inconsistent with our public policy if we extend a homestead exemption to each of two people who are married, but legitimately live apart in separate residences, if they otherwise

meet the requirements of the exemption. When we say 'legitimately' we mean that there is no 'fraudulent or otherwise egregious act' by the beneficiary of the homestead exemption."

*See also Radin v. Radin,* 593 So.2d 1231 (Fla. 3d DCA 1992); *Law v. Law,* 738 So.2d 522, 525 (Fla.Dist.Ct.App.1999)

The Eleventh Circuit in the case of *Colwell v. Royal Int'l Trading Corp. (In re Colwell),* 196 F.3d 1225, 1226 (11th Cir. 1999) stated that the Bankruptcy Court must interpret and apply the Florida exemption law in the same manner as the Florida State Courts.

■ While this record certainly supports and warrants the inference that the Debtor's primary, if not the sole purpose, in purchasing the Florida Condominium was to protect his home from any claim which may be asserted against him by the Slatkin Trustee, this alone is not sufficient to defeat his homestead exemption claim. Under the decision of the Supreme Court of Florida, *In re Havoco of America v. Hill,* 790 So.2d 1018 (Fla.2001) the motive of a Debtor for the purpose of acquiring a homestead is of no consequence and the homestead cannot be reached by creditors unless the Court finds that the transaction falls within the "fraud exception," in which instance the Court may invoke equitable principles to reach beyond the literal language of the exception. *Havoco of America, Ltd. v. Hill opinion after certified question answered* 255 F.3d 1321 (11th Cir.2001)

■ It is well established that it is a time honored principle of Florida's jurisprudence that the constitution provisions dealing with homestead were founded upon considerations of public policy. They are designed to promote the stability and welfare of the State by encouraging property ownership and independence on the part of its citizens, but most importantly, by preserving a home where the family may be sheltered and live behind reach of economic misfortune. *In re Colwell,* 208 B.R. 85 (Bankr.S.D.Fla.1997); *In re Bubnak,* 176 B.R. 601 (Bankr.M.D.Fla.1994); *In re McAtee,* 154 B.R. 346 (Bankr. M.D.Fla.1993); *In re Ehnle,* 124 B.R. 361 (Bankr.M.D.Fla.1991).

It is also clear however, that the protection afforded by the Florida constitution and the statutes dealing with this subject are available only to citizens and residences of the states which opted-out pursuant to Section 522(b)(2)(A) of the Code. The Code specifically provides that debtors may only exempt properties under local law which is applicable on the date of the filing of the Petition in which the debtor's domicile had been located for 180 days immediately preceding the date of filing of the Petition, or for longer portion of such 180 day period than in any other place.

Specifically, Section 522(b)(2)(A) provides as follows:

Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate the property listed . . . in paragraph (2) of this subsection. Such property is—

(2)(A) any property that is exempt under Federal law . . . or State or local law that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180–day period than in any other place. . . .

■ Accordingly, this Court must determine (1) whether the Debtor was physically present in this State for the greater part of the 180 day period preceding the Petition date and (2) whether the Debtor intended to remain here indefinitely. *In*

re Sparfven, supra; In re Lowenschuss, 171 F.3d 673, 683 (9th Cir.1999), cert. denied, 528 U.S. 877, 120 S.Ct. 185, 145 L.Ed.2d 156 (1999); Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 48, 109 S.Ct. 1597, 1608, 104 L.Ed.2d 29 (1989); In re Ring, 144 B.R. 446 (Bankr. E.D.Mo.1992); District of Columbia v. Murphy, 314 U.S. 441, 62 S.Ct. 303, 86 L.Ed. 329 (1941); In re Hodgson, 167 B.R. 945 (D.Kan.1994).

■ Exceptions to the exemptions should be strictly construed, and constitutional limitations on alienation of homesteads must be strictly construed in favor of the homestead claimant. In re Clements, 194 B.R. 923 (Bankr.M.D.Fla.1996); Heath v. First Nat. Bank in Milton, 213 So.2d 883 (Fla.Dist.Ct.App. 1st Dist.1968). Party challenging homestead exemption claim has burden to make strong showing that debtor is not entitled to claimed exemption. In re Harrison, 236 B.R. 788 (Bankr.M.D.Fla.1999).

■ Applying these principles to the facts of this case as established at the trial, it is clear that if the evidence on the issue of entitlement to homestead is in equilibrium at most, and equally supports the homestead claim and the claim of the Slatkin Trustee who challenged the claim, the challenge must be rejected and the Debtor's right to homestead protection must be recognized.

In sum, this Court is satisfied that the Slatkin Trustee failed to establish with the requisite degree of proof that the Debtor's claim to homestead exemption of the Naples Condominium is not exempt. Therefore, the Objection should be overruled.

## THE RETIREMENT ACCOUNTS

■ Before turning to discuss the request for the imposition of an equitable lien, it should be noted that the Slatkin Trustee now contends that he has also objected to the Debtor's claim of exemption of CSFB IRA Rollover account in the amount of $15,552.76; Solomon Smith Barney IRA Rollover account in the amount of $204,365.00 and USL Annuity FBO Lang in the amount of $1,210,322.00. The Slatkin Trustee realizing, as he must, that the challenge of the exemption claim of the Debtor to these items was insufficient as pled, filed a motion and sought leave to amend pleadings to conform to evidence. On June 30, 2005, this Court entered an Order and denied the Motion, having concluded that the original challenge was vague and unspecific and the only basis which was asserted was that "the Slatkin Trustee, however, has been unable to verify whether these accounts are 'qualified' retirement accounts as required by Florida Statutes § 222.21(2)(a)." Clearly, that was legally insufficient to challenge and to overcome the presumptive validity of the Debtor's claim to exempt these items. Moreover, the Slatkin Trustee was unable to present any evidence whatsoever that these accounts were not qualified as retirement accounts required by Fla.Stat. 222.21(2)(a). Based on the foregoing, this Court denied the Motion to Amend the Pleadings.

## REQUEST FOR EQUITABLE LIEN

■ The Slatkin Trustee seeks the imposition of an equitable lien on the Florida Condominium as an alternative relief to his challenge of the homestead exemption. The imposition of an equitable lien under applicable state law, in this particular case the laws of the State of Florida apply. In the case of Palm Beach Savings & Loan Ass'n, F.S.A. v. Fishbein, 619 So.2d 267 (Fla.1993), The Florida Supreme Court stated that when equity demanded, the Court has not hesitated to impose an equitable lien on homesteads behind the literal

language of Article X, Section 4 of the Florida Constitution. *Id.* at 270.

Equitable liens are based on the premise/that one should not benefit from unjust enrichment. *See Blumin v. Ellis,* 186 So.2d 286, 294 (Fla. 2d DCA 1966) *cert. denied,* 189 So.2d 634 (Fla.1966). In the case of *In re Chauncey,* 308 B.R. 97 (Bankr.S.D.Fla.2004) a debtor converted proceeds from a personal injury settlement into equity in her homestead in a carefully planned series of actions designed to defraud her creditors. Judge Hyman in this case held:

> "The Court holds that the Debtor cannot profit from her strategic and intentional delay of her bankruptcy filing. Further, the Court holds that the Debtor cannot act to the detriment of her creditors and then use the homestead to deprive the estate of funds that would have been available if not for her actions. As such, the imposition of an equitable lien in favor of the Trustee is necessary to prevent the Debtor from using the homestead exemption as an instrument of fraud and to prevent the Debtor from being unjustly enriched in this case."

*Id.* at 108.

In Florida the general view is that "Equitable liens may be found upon two bases: (1) a written contract that indicates an intention to charge a particular property with debt or obligation; or, (2) a declaration by a court out of general considerations of right or justice as applied to the particular circumstances of a case." *In re Tsiolas,* 236 B.R. 85, 88 (Bankr.M.D.Fla. 1999) (citing *Jones v. Carpenter,* 90 Fla. 407, 413–414, 106 So. 127 (1925); *Ross v. Gerung,* 69 So.2d 650, 652 (Fla.1954)).

In the case of *Palm Beach Savings and Loan Assoc., F.S.A. v. Fishbein, supra,* at 271, the Florida Supreme Court stated that "in order to prevent unjust enrichment" and "where equity demands," equity liens can encumber homestead property. Thus, courts imposing equitable liens on homestead property require a very high standard.

This record leaves no doubt that the Debtor was not an active participant in the Ponzi scheme carried on by Slatkin, but he was merely a "net recipient" of funds greater than he invested with Slatkin. There is no evidence in this record that there was a written contract or that the ground to impose an equitable lien is applicable in the present instance. The proceeds used to purchase the Florida Condominium were not funds realized from a fraudulent or reprehensible conduct of the Debtor. The facts in this case are a far cry from the type of fraud which comes within the exception announced by the Court in *Havoco v. Hill, supra.* Therefore, this Court is constrained to reject the request for the imposition of an equitable lien which is not supported by the facts of this case or the applicable law.

## OBJECTION TO DEBTOR'S DISCHARGE Count II, Section 727(a)(2)(A)

This leaves for consideration the claims asserted by the Slatkin Trustee challenging the Debtor's right to the protection of the general bankruptcy discharge. The claim in Count II of the Complaint is based on 727(a)(2)(A) and the Slatkin Trustee alleges that:

> "Laing fraudulently transferred assets within the one-year period from the Petition date with intent to hinder, delay or defraud a creditor or an officer of the estate charged with the custody of property under the Bankruptcy Code, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed such property."

It doesn't appear from the pleading what property is alleged to have been transferred, but it is apparent from this record that the Slatkin Trustee's primary concern was the purchase of the Condominium which he claimed to have been purchased by converting nonexempt funds into exempt property.

Before discussing the facts as appear from the record relevant to the claim of the fraudulent transfer, it should be pointed out what is and what is not involved in the allegation concerning the fraudulent transfer pled in the Complaint by the Slatkin Trustee. This is not a suit to recover properties which were fraudulently transferred by the Debtor within one year of the date of the Petition under Section 548 of the Bankruptcy Code. What is involved in this Count is that a challenge under Section 727(a)(2)(A) of the Debtor's right to the protective provisions of the general discharge. It is well established and there are respected authorities to support the proposition that receiving funds derived from a fraudulent transfer when the recipient knew that the funds were obtained through fraud would warrant a judgment ordering the return of the funds from the recipient. *In re Hedged Investments Associates, Inc.*, 176 B.R. 214 (D.Colo.1994); *In re International Network*, 160 B.R. 1 (Bankr.D.Dist.Col.1993) *In re M & L Business Machine Company, Inc.*, 164 B.R. 657 (D.Colo.1994); *In re Mark Benskin & Co., Inc.*, 161 B.R. 644 (Bankr. W.D.Tenn.1993); *In re World Vision Entertainment, Inc.*, 275 B.R. 641 (Bankr. M.D.Fla.2002).

So far this Court has been unable to find a case which would warrant the denial of discharge of one who is the recipient of funds obtained through fraud. In this particular instance, the Ponzi scheme was operated by Reed Slatkin and not by the Debtor.

In the present instance that the transfer which allegedly was fraudulent was the conversion of the Debtor's non-exempt assets into the Florida Homestead which the Debtor claimed as exempt under Article X, Section 4 of the Florida Constitution. This is not the orthodox transfer condemned by the Section because the transferor and transferee is identical. However, it is well established that the statute does not require that the transfer is made to another person. Courts have held that similar conversation of non-exempt assets to exempt assets were transfers under the Uniform Fraudulent Transfer Act. *See In re Levine*, 134 F.3d 1046, 1050 (11th Cir. 1998).

The difficulty with the position of the Slatkin Trustee's claim based on 727(a)(2)(A) is that the conversion occurred in the year 2002 when the Debtor purchased the Condominium in Naples, Florida and he filed his Petition for relief in this Court on February 25, 2004, or more than one year as required by the Statute to establish a viable claim under this Section.

Based on the foregoing, this Court is satisfied that the Slatkin Trustee has not established with the requisite degree of proof all operating elements of the claims asserted in the Complaint. Therefore, this Court is satisfied that the Slatkin Trustee's request for entry of an Order denying Debtor's discharge pursuant to 11 U.S.C. 727(a)(2)(A), should be denied.

### OBJECTION TO DEBTOR'S DISCHARGE COUNT III, Sections 727(a)(3) and (a)(4)(A)

The claims in Count III of the Complaint actually assert two separate grounds to deny the discharge. One is based on Section 727(a)(3) and the other is based on Section 727(a)(4)(A).

■ Turning first to the second claim alleged by the Slatkin Trustee in Count III based on Section 727(a)(4)(A) charging that the Debtor committed false oath in bankruptcy. This record is totally devoid of any persuasive evidence which would support this claim. It is the contention of the Slatkin Trustee that the false oath allegedly committed by the Debtor was that the debtor claimed as exempt the Condominium as his homestead. The claim of exemption was not a false statement of existing fact which was material. It was merely a contention whose validity was attacked by the Slatkin Trustee. Thus, the Slatkin Trustee's allegation of false oath is way off the mark.

■ The other claim asserted by the Slatkin Trustee in Count III is based on Section 727(a)(3) where it is alleged that:

"The Debtor has concealed, destroyed, mutilated, falsified or failed to keep or preserve any recorded information, including books, documents, records and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case."

Considering this claim, it should be pointed out at the outset that this Court already stated during the trial that there was not one iota of evidence that the Debtor ever mutilated or destroyed or concealed or falsified any of his books and records. During an extensive discovery process, the Debtor furnished more than 4000 copies to counsel for the Slatkin Trustee. In addition to the hard copies of documents, the Defendant's expert furnished digital copies or discs which contained the Debtor's general ledger and a software program called "Quick Books" which provided a detail of all payees and classified all inflows and outflows of monies. According to an expert presented by the Debtor, the Debtor's financial records were more than adequate to prepare tax returns for the years 2000, 2001, 2002 and 2003.

In sum, this Court is satisfied that the proof presented by the Slatkin Trustee in support of the two separate claims set forth in Count III, failed to meet the degree required under the law to deny the discharge.

### COUNT IV Section 727(a)(5)

■ The last ground to deny the Debtor's discharge is alleged in Count IV. In this count, the Slatkin Trustee alleges that the Debtor has failed to explain satisfactorily a loss of assets or deficiency of assets to meet his liabilities.

■ In order to have a viable claim under this Section, the record must warrant the finding that the factors set forth in the case of *In re Hyers*, 70 B.R. 764, 772 (Bankr.M.D.Fla.1987) have been established. The factors are as follows:

"Pursuant to § 727(a)(5) of the Bankruptcy Code, it should be noted at the outset that in order to sustain a claim under this Section it is the burden of the Plaintiff to establish with the requisite degree of proof that the Debtor at one time owned a substantial identifiable asset, not too remote in time to the date of the commencement of the case; that on the date of filing the voluntary Petition the Debtor no longer had the particular asset, and when called upon to explain its disposition, he was unable to furnish a satisfactory explanation."

Section 727(a)(5) does not specify a time frame which would be relevant to deal with this issue but several courts held that the Debtor must have had cognizable legal or equitable interest in the property involved not too far removed in time from the date of the commencement of the case. *In re Bernstein*, 78 B.R. 619, 622 (S.D.Fla.1987); *In re Straub*, 192 B.R. 522, 525 (Bankr.

D.N.D.1996); *In re Piscioneri,* 108 B.R. 595, 604 (Bankr.N.D.Ohio 1989).

In the case of *In re Olbur,* 314 B.R. 732 (Bankr.D.Ill.2004) the Court held that:

"... a debtor should not be deprived of a discharge merely because he can no longer explain (or can explain but cannot document) a loss of assets years before the bankruptcy. How long ago is too long ago depends on the case; there is no hard and fast rule."

*Id.* at 741 *citing Hermanson,* 273 B.R. 538, 552 (Bankr.N.D.Ill.2002).

The documentary evidence furnished by the Debtor gives a detailed disclosure of all of his financial transactions going back to 1998. For instance, the General Ledger of the Debtor has 3400 entries. In addition, he produced statements on his various accounts that he maintained between 1998 and 2004 with several institutions. These statements set forth approximately 7126 entries, broken down as follows:

| | |
|---|---|
| A.G. Edwards 12/23/98—2003 | 30 entries |
| AmSouth Money Market Account May 9, 2002—5/31/2004 | 45 entries |
| AmSouth Bank account checking & savings 5/1/2002—2/29/04 | 644 entries |
| ING Investment Account 12/10/98—5/31/01 | 26 entries |
| Mid City National Bank, checking 2/1/95—4/30/01 | 2197 entries |
| PNC checking and savings 5/1/02—3/31/04 | 56 entries |
| 1st. Smith Barney Investment Acct. 3/1/00—4/30/02 | 104 entries |
| 2nd Smith Barney Investment Acct 3/1/00—4/30/02 | 143 entries |
| Wells Fargo Checking & Savings 3/1/01–12/31/02 | 481 entries |

The record also includes documentary evidence concerning the transactions involving the purchase or sale of the Debtor's residences, including: the sale of his home in Lake Forest, Illinois June 29, 2000 (Def.Exh. 10); purchase of his Santa Barbara home July 14, 2000 (Def.Exh. 11); sale of Santa Barbara home April 10, 2002 (Def.Exh. 12); purchase of Florida home April 18, 2002 (Def.Exh. 13).

The Debtor also produced approximately 139 pages of documents to the Trustee, which included IRA information, as well as tax returns for the years 2000, 2001, 2002, and a form 1045 for 2001, and exam by the IRS for the year 2001 (Def.Exh. 27)

The Slatkin Trustee is unable to dispute the accuracy of these records, but contends, and this is also supported by the record, that the Debtor could not produce documentation for the receipt or disposition of only $150,000.00. According to the Debtor's expert when he questioned the Debtor about the $150,000.00, he received an explanation, albeit no documentation, which he found to be satisfactory. Be that as it may, in light of the massive documentation of the Debtor's finances going as far back as 1998, this Court is satisfied that the lack of documentation concerning the receipt and the disposition of the $150,000.00 is of no consequence when one considers the total picture of the Debtor's finances.

When the Debtor lost his job with Link Capital, he also lost his investment in Link Capital. His claimed assets relating to the EarthLink stock never came to fruition and also added to the drastic deterioration of the Debtor's finances. Moreover, after 2001 to the date of filing his Bankruptcy Case in 2004, there was no radical change or shrinkage in the Debtor's financial condition.

While it is true that some records are not available, and have not been produced, the Debtor's expert had no difficulty to prepare the appropriate tax returns filed by the Debtor and, with the possible exception of an examination of the 2001 return, they were not challenged by the I.R.S.

In sum, this Court is satisfied that the proof presented by the Slatkin Trustee in support of the claims set forth in Count IV, failed to meet the degree required under the law to deny the discharge. Therefore, the Debtor's discharge cannot be denied on this ground.

Based on the foregoing, this Court is satisfied that the Slatkin Trustee has not established with the requisite degree of proof all operating elements of the claims asserted in:

Count I—Objection to the Debtor's homestead exemption/imposition of equitable lien;

Count II—Denial of Discharge Pursuant to Bankruptcy Code Section 727(a)(2)(A);

Count III—Denial of Discharge Pursuant to Bankruptcy Code Sections 727(a)(3) and 727(A)(4)(A);

Count IV—Failure to Satisfactorily Explain Loss of Assets Pursuant to Bankruptcy Code Section 727(a)(5)

A separate final judgment shall be entered in accordance with the foregoing.

### *FINAL JUDGMENT*

THIS CAUSE came on for consideration upon the Court's own Motion for the purpose of entering a Final Judgment in the above-captioned adversary proceeding. The Court has considered the record and finds that this Court has entered its Findings of Facts, Conclusions of Law and Memorandum Opinion. Therefore, it appears appropriate to enter this Final Judgment.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that Final Judgment be, and the same is hereby, entered in favor of the Debtor/Defendant, Robert Laing and against the Plaintiff, R. Todd Neilson, Trustee of the Estate of Reed E. Slatkin and the Substantively Consolidated Affiliates Topsight Oregon, Inc., and Reed Slatkin Investment Club, L.P., Liquidating Trust as to the claim in Count I (Objection to Debtor's Homestead Exemption/Imposition of Equitable Lien). The Slatkin Trustee's Objection to Debtor's claim of Homestead Exemption be, and the same is hereby, overruled and it is ordered and determined that the Naples Condominium is exempt and within the protection of Article X, Section 4 of the Florida Constitution. The alternative request for an equitable lien on the Homestead property be, and the same is hereby, denied. It is further

ORDERED, ADJUDGED AND DECREED that Final Judgment be, and the same is hereby, entered in favor of the Debtor/Defendant, Robert Laing and against the Plaintiff, R. Todd Neilson, Trustee of the Estate of Reed E. Slatkin and the Substantively Consolidated Affiliates Topsight Oregon, Inc., and Reed Slatkin Investment Club, L.P., Liquidating Trust as to the claims in Count II (Denial of Discharge Pursuant to Bankruptcy Code Section 727(a)(2)(A)); Count III (Denial of Discharge Pursuant to Bankruptcy Code Sections 727(a)(3)) and 727(A)(4)(A); Count IV (Failure to Satisfactorily Explain Loss of Assets Pursuant to Bankruptcy Code Section 727(a)(5)).

The claims asserted in Counts II, III, and IV be, and the same are hereby, dismissed with prejudice. The Debtor shall be entitled to obtain his general bankruptcy discharge by entry of a separate order.